UNITED STATES BANKRUPTCY COURT
**District of Colorado**

| | | |
|---|---|---|
| In re: | | |
| SKIN PC, | ) | Case No. 19-11650 MER |
| Debtor. | ) | Chapter 11 |
| | ) | |
| In re: | ) | |
| KEVIN JOHN MOTT, | ) | Case No. 19-11647 MER |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| LAKE LOVELAND DERMATOLOGY, P.C. | ) | Case No. 19-11659 MER |
| a Colorado professional corporation | ) | Chapter 11 |
| EIN 84-0825679 | ) | |
| Debtor. | ) | **Jointly administered** |
| | ) | **Under Case No. 19-11650** |
| | ) | **MER** |

---

**REPLY IN SUPPORT OF MOTION TO ASSUME LEASE AGREEMENT
DATED NOVEMBER 1, 2011 [Dkt. 126]**

Debtor-in-Possession, Lake Loveland Dermatology, P.C. ("Debtor"), through its

counsel, Allen Vellone Wolf Helfrich & Factor P.C., submits this reply in support of

its Motion to Assume Lease Agreement Dated November 1, 2011 (the "Motion"). [Dkt.

126]. In support of the Motion, the Debtor states as follows:

**INTRODUCTION**

Patrick Lillis was the controlling shareholder of the Debtor and the managing

member of 790 Eisenhower, LLC ("Eisenhower") when he caused the Debtor to lease

property from Eisenhower for a ten-year term, commencing on November 1, 2011 and

concluding on November 1, 2021 (the "2011 Lease"). On two occasions, as Lillis was

preparing to sell his controlling position in the Debtor, he surreptitiously caused the

Debtor to enter into new leases with Eisenhower on far less favorable terms than the

2011 Lease but for no new consideration to the Debtor whatsoever.  He did so to lock the Debtor into payment terms that were injurious to the Debtor and beneficial to Eisenhower—and himself—before the putative new owners of the Debtor would learn about and enforce the obligations under the 2011 Lease.

Given that Lillis caused the Debtor to enter into two new leases—the August 1, 2012 Lease Agreement (the "2012 Lease") and June 1, 2016, Lease Agreement (the "2016 Lease")—for no new consideration, they are void as a matter of law.  As such, the 2011 Lease is the only lease the Debtor can assume.

Debtor has filed an adversary proceeding against Eisenhower, 19-01233-MER ("Adversary"), seeking a declaration that the 2012 and 2016 Leases are void.  Debtor has filed a motion to reject the 2012 and 2016 Leases and hold in escrow the difference between rent under the 2011 Lease and that under the 2016 Lease, until the Adversary is resolved.  [Dkt. 138].

This Court should permit Debtor to assume the 2011 Lease, make payments under the 2011 Lease, and pay the difference between the 2011 and 2016 Leases into escrow until the Adversary is resolved.

## BACKGROUND

1.     The Debtor filed its voluntary Chapter 11 bankruptcy petition on March 8, 2019.

2.     This Court authorized the Debtor to take a Rule 2004 Examination of Eisenhower. [19-11659-MER Dkt. 98].

.

3.      Eisenhower produced documents to the Debtor pursuant to the Debtor's Rule 2004 subpoena on July 24, 2019.

4.      The Debtor took Eisenhower's Rule 2004 deposition on July 31, 2019.

5.      In connection with the Rule 2004 subpoena and examination, the Debtor learned for the first time that, while he was the sole owner and operator of the Debtor, Lillis caused the Debtor and Eisenhower to enter into two separate leases that subjected the Debtor to higher rent for a longer term than the Debtor's underlying lease.

6.      Lillis caused the Debtor to enter into those two leases for his own benefit and without obtaining anything of value in return for the Debtor.

7.      Specifically, Lillis caused the Debtor to enter into the 2011 Lease, which commenced on November 1, 2011 and was to terminate on November 1, 2021.  The 2011 Lease had an annual rent of $156,091.18 that increased by 3% per year.  A copy of the 2011 Lease is attached as **Exhibit 1**.

8.      Only nine months into the ten-year term of the 2011 Lease, Lillis caused the Debtor to execute the 2012 Lease.

9.      Lillis caused the Debtor to execute the 2012 Lease because he believed that two doctors would be purchasing the majority of Debtor's equity in the near future, and Lillis wanted to lock the Debtor into a higher rent and longer term, all for the benefit of Eisenhower, before selling his controlling position in Debtor.

10.      The 2012 Lease makes no mention of the 2011 Lease and does not state that it amends or supersedes the 2011 Lease.

11. Debtor was not in default under the 2011 Lease when Lillis caused it to sign the 2012 Lease.

12. The 2012 Lease commenced on August 1, 2012, and terminated on July 31, 2022. The 2012 Lease subjected the Debtor to a higher annual rent of $259,160.00 that increased by 3% per year. A copy of the 2012 Lease is attached as **Exhibit 2**.

13. The Debtor received no new consideration whatsoever in exchange for agreeing to pay more rent for a longer period of time than under the existing, operative November 2011 lease. Rather, only nine months into a 10-year term, Lillis unilaterally caused the Debtor to agree to pay more rent in exchange for no new consideration, and did so solely to benefit himself as the sole member of Eisenhower.

14. Then, on June 1, 2016—less than five years into the 10-year lease term under the November 2011 lease—Lillis again caused Eisenhower and the Debtor to enter into a new lease that subjected the Debtor to higher rent for a longer term.

15. The 2016 Lease commenced on June 1, 2016, and terminated on May 31, 2026. It subjected the Debtor to a higher annual rent of $306,751.20 that increased by 3% per year. A copy of the 2016 Lease is attached as **Exhibit 3**.

16. By that time, Lillis's medical license had been suspended. Because only licensed doctors may own a medical practice, Lillis was, therefore, contemplating selling the Debtor, and like with the 2012 Lease increase, wanted to lock the Debtor into a higher rent rate and longer term before doing so.

17. The 2016 Lease makes no mention of the 2011 Lease or the 2012 Lease, and does not state that it amends or supersedes the 2011 or 2012 Leases.

18.     Debtor was not in default under the 2011 or 2012 Leases when Lillis caused it to sign the 2016 Lease.

19.     Tellingly, Lillis did not cause the Debtor to be represented by counsel when executing the 2012 Lease or the 2016 Lease.

20.     If the November 2011 lease were still operative, the annual rent today would be about $192,000 and the monthly rent would be approximately $16,000. Instead, the Debtor's annual rent is approximately $335,000 and the monthly rent is approximately $28,000.

21.     Lillis did not disclose the 2011 Lease or 2012 Lease to Dr. Mott or Skin, P.C. prior to selling the Debtor to them on October 16, 2016.

22.     Dr. Mott did not know about the existence of the 2011 Lease or 2012 Lease until Eisenhower produced them on July 24, 2019 in response to a Rule 2004 subpoena.

## DISCUSSION

### A.     Assumption of the 2011 Lease Will Benefit the Debtor's Estate

Pursuant to 11 U.S.C. § 365(a), a debtor-in-possession may assume or reject leases, subject to bankruptcy court approval. Courts use the business judgment test when determining whether the Court should approve a proposed assumption. *See In re Railyard Co., LLC*, 562 B.R. 481, 488 (Bankr. D. N.M. 2016). The business judgment test "merely requires a showing by the . . . Debtor-In-Possession that rejection [or assumption] of the contract will be likely to benefit the estate." *See In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887, 896 n. 13 (10th Cir. 1990) (internal

quotations and citations omitted).  Given that the 2012 Lease and 2016 Lease are void—or, at the very least, arguably void—for lack of consideration and that rent under the 2011 Lease is sustainable while rent under the 2016 Lease is not, the Debtor meets the business judgment test by assuming the 2011 Lease.  Moreover, it would not be in Debtor's interest to make payments under the 2016 Lease while litigating its validity.  If it prevails in the Adversary, Debtor may be unable to recoup the excess rent paid under the 2016 Lease during the pendency of the case.  By contrast, if Debtor is permitted to escrow the difference in rent, it will be guaranteed recoupment upon successful resolution of the Adversary.  That approach is manifestly in the Debtor's best interest.

In connection with the 2012 Lease and the 2016 Lease, Eisenhower was required to provide some new value to the Debtor in exchange for the Debtor's agreement to pay higher rent for a longer term.  Lillis favored himself over the Debtor and did not give the Debtor anything of value in exchange for the Debtor's agreement to pay higher rent and stay in the property longer.  It is black letter law that a contract—or amendment to a contract—that lacks consideration on both sides is invalid.  *See ex. Chavez v. New Mexico,* 397 F.3d 826, 831 (10th Cir. 2005) (A valid contract "must be factually supported by an offer, an acceptance, consideration, and mutual assent."); *Computer Scis. Corp. v. Ibarra*, 685 F. Supp. 748, 754 (D. Colo. 1988) (contracts are "unenforceable for lack of consideration"); *see also Oscar v. Simeonidis*, 800 A.2d 271, 277 (N.J. App. 2002) (modification to existing lease agreement that increased rent required consideration on all sides); *Colonie Const. Corp. v. DeLollo*,

6

266 N.Y.S.2d 283 (N.Y. App. Div. 1966) (modification increasing price of real property unenforceable because, among other things, agreement lacked consideration); *Torrey v. Adams*, 149 N.E. 618, 620 (Mass. 1925) ("In the case at bar there was no consideration for the tenant's promise to pay the increase of rent. The original contract was not waived or rescinded. It continued in force as a lease . . . . The landlord gave the tenant nothing except what he already had for the tenant's agreement to pay more rent. There was neither a gain to the promisor nor a detriment to the promisee."); *Jadronja v. Bricker*, 174 S.E. 251, 252 (Ga. App. 1934) ("An agreement by a party to a lease to perform an act which he is required to perform by the original lease does not constitute a consideration . . . . So, as is the case with all new agreements which modify existing obligatory contracts, a consideration of some sort is held necessary to support any promise by either landlord or tenant which substantially modifies the terms of the existing tenancy[.]"); *Perry v. Farmer*, 54 P.2d 999, 1001 (Ariz. 1936) ("it is held practically universally that any agreement between landlord and tenant substantially modifying the terms of the tenancy cannot be enforced by either party, unless there is a valid consideration therefor"). The 2012 Lease and 2016 Lease are both invalid and cannot have superseded the 2011 Lease, as a matter of law.

By assuming the 2011 Lease, the Debtor will not be dumping money towards an invalid lease. Conversely, if it were to assume the 2016 Lease and that lease is ultimately voided, the Debtor would have to pursue Eisenhower for repayment of the delta between the 2011 Lease and 2016 Lease, which would keep creditors waiting

for payment longer than they otherwise would. The Debtor meets the business judgment test by assuming the 2011 Lease—the only valid lease.

Furthermore, with the 2011 Lease, the Debtor will pay approximately $12,000.00 less in monthly rent to Eisenhower than it would under the 2016 Lease. This will leave more money to satisfy the Debtor's creditors while still compensating Eisenhower. If the 2016 Lease is ultimately found to be the operative Lease, Eisenhower—with this Court's authorization—will receive the escrowed delta of the lease payments between the 2011 Lease and 2016 Lease. Eisenhower, therefore, will be minimally prejudiced by the Debtor assuming the 2011 Lease.

It would be no benefit to the estate if the Debtor were to either 1) reject its Loveland leases and cease operations in that city; or 2) assume an arguably invalid lease with an unsustainable rental rate. The Court should permit the Debtor to assume the 2011 Lease. *See In re Railyard Co., LLC*, 562 B.R. at 488 (the Court should approve a proposed assumption or rejection "unless it is manifestly unreasonable or derives from bad faith, whim, or caprice."); *see also In re Western Wood Products, Inc.*, No. 12-1172 J, 2013 WL 1386285 at *21 (Bankr. D.N.M. April 4, 2013) (same).

## B.   The Debtor is Not Bound by the Stock Purchase Agreement's Purported Ratification of the 2016 Lease

Eisenhower relies on provisions of the Stock Purchase Agreement ("SPA") in support of its argument that the 2016 Lease is the only lease the Debtor can assume. However, Lillis intentionally concealed the 2011 and 2012 Leases from Dr. Mott in connection with the SPA As such, Dr. Mott did not know about the 2011 Lease, the

absence of consideration for the 2012 Lease and 2016 Lease, and how that lack of consideration rendered those leases invalid. Thus, Dr. Mott's purported assent to the "validity and enforceability of the 2016 Lease"[1] (Dkt. 129 at p. 10) was not knowingly made and was a direct result of Lillis's misconduct. *See Edmondson v. Coates,* No. 01–A–01–9109–CH324, 1992 WL 108717, *11 (Tenn .App. May 22, 1992) (to enforce a contract where a party withheld "material information would be to blindly enforce a contract obtained by fraud").

Given Lillis's concealment of material facts, it would be inequitable to enforce the SPA's terms relating to the 2016 Lease. *See United States v. Leach*, 749 F.2d 592, 598 (10th Cir. 1984) ("agreement was *void ab initio* by virtue of [party's] fraudulent misrepresentation"); *Bennett v. Coors Brewing Co.,* 189 F.3d 1221, 1229 (10th Cir.1999) ("Under general contract principles, it is well established that a contract  is void and unenforceable if procured through fraud.") (*citing* Restatement (Second) Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced  by a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient")); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (1967) ("[t]he law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it"); *Snyder v. Lovercheck,* 992 P.2d 1079, 1084 (Wyo. 1999) ("a party to a contract is not bound by a [contractual term] if it was fraudulently obtained").

---

1 As it relates to the SPA, the 2011 Lease and 2012 Lease would be "material" given the SPA sought to bind Dr. Mott to the "continued validity and enforceability of the [2016] Lease." *See* Exhibit C to Dkt. 129 at Section 27.

Moreover, because Eisenhower and Lillis intentionally concealed the 2011 and 2012 Leases from Dr. Mott, it cannot be said that Dr. Mott and Skin ratified the amendment and supersession of these Leases. Ratification requires knowledge, which Dr. Mott and Skin lacked. *See Siener v. Zeff*, 194 P.3d 467, 472 (Colo. App. 2008) ("To exercise choice and consent, a principal must have full knowledge of all material facts of the transaction prior to the ratification."); *Chicago Title Ins. Co. v. Progressive Hous., Inc.*, 453 F. Supp. 1103, 1109 (D. Colo. 1978) (where title insurance company employees withheld material facts, application of equitable concept of ratification affording title insurance company relief was impermissible); *Adams v. Paine, Webber, Jackson & Curtis, Inc.*, 686 P.2d 797, 801 (Colo. App. 1983) ("[a]bsent knowledge of material facts, ratification is not possible"). Eisenhower bears the burden of proving that Dr. Mott and Skin possessed sufficient knowledge to validly ratify Lillis's conduct. *Siener*, 194 P.3d. at 473 ("The burden of showing ratification with full knowledge of all material facts generally is on the party alleging it."); *Film Enterprises, Inc. v. Selected Pictures, Inc.*, 138 Colo. 468, 478 (1959) (Ratification may take place only when party has full knowledge of all circumstances surrounding transaction and "the burden of proof to show ratification of a contract with full knowledge of all the material facts, is on the party alleging it"). Moreover, "[r]atification, and its requirement of knowledge, is a question of fact." *Siener*, 194 P.3d. at 473. Presumably, Eisenhower will assert ratification as an affirmative defense in the Adversary and the burden will be on it to prove all essential elements. That is not an issue that can, or should, be resolved at this point. Rather,

Eisenhower's reliance on a ratification defense provides further reason that moneys should be held in escrow until the Adversary is finally adjudicated.

WHEREFORE, the Debtor respectfully requests the Court allow the Debtor to assume the 2011 Lease.

DATED this 10th day of September, 2019.

Respectfully submitted,

Allen Vellone Wolf Helfrich & Factor P.C.

/s/ Jordan Factor
Jordan Factor, Esq.
Michael Gilbert, Esq.
Jeremy T. Jonsen, Esq.
1600 Stout Street, Suite 1100
Denver, Colorado 80202
Phone Number: (303) 534-4499
jfactor@allen-vellone.com
mgilbert@allen-vellone.com
jjonsen@allen-vellone.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of September 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, who will also serve it on the following:

Paul V. Moss, Esq. U.S.
Trustee's Office
1961 Stout St., Ste. 12-200
Denver, CO 80294

Lake Loveland Dermatology, P.C.
Attn: Tim Woodworth
776 West Eisenhower Blvd.
Loveland, CO 80537

790 Eisenhower, LLC
Attn: Patrick J. Lillis
790 West Eisenhower Blvd.
Loveland, CO 80537

Matthew T. Faga, Esq.
Jennifer M. Salisbury, Esq.
Markus Williams Young & Hunsicker, LLC
1700 Lincoln St., Ste. 4550
Denver, CO 80203
*Counsel for Landlord, 790 Eisenhower,*
*LLC*

Douglas W. Brown, Esq.
Neal K. Dunning, Esq.
Brown Dunning Walker PC
2000 South Colorado Blvd.
Tower Two, Suite 700
Denver, CO 80222

Jeffrey A. Weinman, Esq.
730 17th Street, Suite 240
Denver, CO 80202-3506

Frank W. Visciano, Esq.
Senn Visciano Canges, P.C.
1700 Lincoln St., Ste. 4300
Denver, CO 80203

Keith C. Owens, Esq.
Venable LLP
2049 Century Park East, 23rd Floor
Los Angeles, CA 90067

Valerie Smith, Synchrony Bank
c/o PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541

*/s/ Lisa A. Vos*
Lisa A. Vos